IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 14, 2015 at Jackson

**DEMANCE M. BEASLEY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2018    Monte Watkins, Judge**

---

**No. M2014-01507-CCA-R3-PC – Filed August 13, 2015**

---

The petitioner, Demance M. Beasley, appeals from the denial of his petition for post-conviction relief, which challenged his Davidson County Criminal Court jury convictions of felony murder, aggravated assault, and possession with intent to sell .5 grams or more of cocaine. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and NORMA MCGEE OGLE, J., joined.

Manuel Benjamin Russ, Nashville, Tennessee, for the appellant, Demance M. Beasley.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Roger Moore, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

In September 2010, a Davidson County Criminal Court jury convicted the petitioner, who originally had been charged with two counts of felony murder, one count of premeditated murder, one count of aggravated assault, and one count of possession with intent to sell .5 grams or more of cocaine, of one count of felony murder, one count of reckless homicide, one count of voluntary manslaughter, one count of aggravated assault, and one count of possession with intent to sell .5 grams or more of cocaine. The trial court merged the convictions of reckless homicide and voluntary manslaughter into the conviction of felony murder and imposed a life sentence for that conviction. The court imposed a sentence of six years for the conviction of aggravated assault and a sentence of 12 years for the cocaine possession conviction. The court ordered that all of

these sentences be served concurrently but consecutively to the defendant's sentence in an unrelated case.

This court affirmed the judgments on direct appeal, *see State v. Demance Beasley*, No. M2011-00228-CCA-R3-CD, slip op. at 1, (Tenn. Crim. App., Nashville, June 6, 2012), and our supreme court subsequently denied the petitioner's application for permission to appeal, *see State v. Demance Beasley*, No. M2011-00228-SC-R11-CD (Tenn. Oct. 17, 2012). The facts, as summarized by this court on direct appeal, established that "a shooting . . . occurred during a drug transaction in a residential area in Davidson County, which resulted in the aggravated assault of Antwaun Jordan and the first degree felony murder of Sherry Bond." *Id.*, slip op. at 2. At trial, Mr. Jordan testified "that he lived 'across the yard' from [Ms. Bond] in a housing development located on Blank Street in Nashville, Tennessee," "that he knew the [petitioner]," and that on January 5, 2007, he "took the [petitioner] and the [peititioner's] 'little brother' to [Ms. Bond's] apartment to meet with her son, Charles Bond, who lived with her." *Id.* Mr. Jordan recalled that after Mr. Bond showed the petitioner drugs, the petitioner "pulled a gun from his pocket" and demanded that Mr. Bond "give him everything he got." *Id.* At that point, Mr. Jordan "intervened, calling the [petitioner] by name and stating 'you can't be robbing people like that.'" *Id.* The petitioner then "told Jordan 'we don't say no names around here,'" and then he shot Mr. Jordan in the leg. *Id.*

Mr. Bond's girlfriend, Chasity Howse, testified that "[a]t approximately 8:00 p.m., [Mr.] Bond answered a knock at the door and stepped outside" and that, shortly after Mr. Bond went onto the porch, she heard "one of the men at the door say, '[G]ive it up.'" *Id.*, slip op. at 3. Ms. Bond "walked into the living room, looked out the front door, and then began screaming[,] '[T]hey're robbing him, I'm calling police!'" *Id.* At that point, "a bullet came through the front window and struck [Ms. Bond] in the back." *Id.*

Mr. Bond testified that when the petitioner came to Ms. Bond's residence to purchase drugs from Mr. Bond, the petitioner "pulled a gun from his jacket pocket and pointed it at [Mr.] Bond" before shooting Mr. Jordan and demanding that Mr. Bond "give me everything you got." *Id.*, slip op. at 4. Mr. Bond gave the petitioner the drugs and told the petitioner "that he did not have anything else." *Id.* At that point, Mr. Bond heard Ms. Bond say that she intended to call the police. The petitioner turned to leave, and Mr. Bond went inside. "Within a 'couple of seconds[,]' two gunshots came through the front window." *Id.* One of the bullets struck Ms. Bond, and she died at the hospital.

During an interview with the police, the petitioner acknowledged having fired a weapon but said "that 'bullets going through windows' and someone being shot in the back 'wasn't never intended to happen.'" *Id.*, slip op. at 8. The bullet recovered from

-2-

Ms. Bond's back matched the gun the petitioner acknowledged having fired on January 5, 2007.

Following the denial of his application for permission to appeal to the supreme court, the petitioner filed a timely petition for post-conviction relief, alleging that he had been denied the effective assistance of counsel at trial and on appeal.

At the May 28, 2014 evidentiary hearing, the petitioner acknowledged that trial counsel, the third in a succession of attorneys to be appointed to his case, communicated with him regarding the progress of the case and that the two of them discussed the discovery materials. The petitioner testified that he told counsel that he had consumed drugs and alcohol on the day of the shooting and that he believed he was still intoxicated when he provided the statement to the police following his arrest.

The petitioner said that trial counsel secured the services of Doctor James Walker to evaluate the petitioner prior to trial and that the petitioner spoke to Doctor Walker "about [his] past history" and how his life "just wasn't happy when [he] was younger and older." He said that he told Doctor Walker that he "was on Ecstasy and a drunk." The petitioner maintained that, with regard to his mental history, he had been diagnosed with "a lot of things." He believed that he began receiving "social security" when he was "in the fifth or sixth grade" due to his mental condition. The petitioner recalled that after he was interviewed by Doctor Walker, trial counsel informed him that he did not intend to present Doctor Walker as a witness. He also recalled counsel's telling him that Doctor Walker "was sick and in the hospital." The petitioner claimed that a report authored by Doctor Walker indicated that he "wasn't responsible" given his "mental health conditions" and his intoxication on the day of the shooting.

The petitioner testified that he asked counsel to secure the presence of a woman named Brenda Cotton, who he claimed had been a witness to the shootings. He clarified that he informed his first and second attorneys that Ms. Cotton had been present at the scene during the offenses but that Ms. Cotton had died by the time trial counsel was appointed to his case.

The petitioner testified that an initial report regarding ballistics testing of the bullet recovered from Ms. Bond's body indicated that the bullet had been fired from a nine millimeter weapon and that he had used a .45 caliber weapon. The petitioner said that he alerted his first attorney to the discrepancy and that, after that attorney alerted the court, "they had the TBI" perform further testing. That testing indicated that Ms. Bond had been killed by a .45 caliber bullet.

-3-

The petitioner stated that he asked counsel to move for the exclusion of Mr. Jordan's testimony on grounds that the State had lost two previously-recorded statements given by Mr. Jordan to the police. He recalled that trial counsel "brung [sic] it up" and that "[i]t was a struggle by the DA and a couple of words and . . . that little situation was over with."

At some point, "a family member" provided the petitioner with "a printout" that showed that Mr. Bond had been charged with robbery as a juvenile. He acknowledged that he was unaware of the disposition of that charge but insisted that he mentioned it to trial counsel.

Trial counsel testified that he chose not to seek suppression of the petitioner's statement on the basis of the petitioner's being intoxicated because he did not believe that such a motion would have been successful and because the statement provided "a cogent narrative" of the petitioner's version of the events. He believed that admission of the statement as a means of getting the petitioner's version before the jury was preferable to having the petitioner testify and be subject to cross-examination.

Trial counsel testified that he procured the services of Doctor Walker to have the petitioner evaluated for competency and diminished capacity. He said that he had worked with Doctor Walker "over the years" and that, in the petitioner's case, "we concluded that [Doctor Walker] would be helpful on the sentencing issue." He said that he could not completely recall "why D[octor] Walker concluded that he would not be a helpful witness." During cross-examination, trial counsel stated that Doctor Walker "shared some negative things" in his report that trial counsel "wouldn't have wanted him cross[-]examined about." Although he could not recall specifically what the Doctor had shared, he did recall he felt that Doctor Walker's testimony would cast doubt on the petitioner's "overall veracity."

Regarding the inconsistent ballistics report, trial counsel said that the ballistics examiner stated the correct model number for the murder weapon and stated correctly that the projectile recovered from Ms. Bond's body matched the murder weapon but incorrectly identified the caliber of ammunition that could be fired by the murder weapon. That examiner was later fired, and subsequent testing performed by the Tennessee Bureau of Investigation conclusively established that the bullet recovered from Ms. Bond's body matched the weapon recovered from the petitioner's person. Counsel said that he did not believe, given the circumstances, that it was necessary to bring up the earlier report at trial.

Regarding the loss of Mr. Jordan's recorded statements, trial counsel recalled that he cross-examined both Mr. Jordan and the lead detective regarding the lost

statements. In response, Mr. Jordan acknowledged having lied to the police in those statements. Counsel said that the thought of asking for a dismissal or the exclusion of Mr. Jordan's testimony did not cross his mind.

With regard to Mr. Bond's juvenile adjudication of robbery, counsel said that he had no specific recollection but could not explain why he would not have used the adjudication to impeach the witness.

At the conclusion of the hearing, the post-conviction court took the petition under advisement. In a written order, the court denied post-conviction relief. The court concluded that the petitioner had failed to establish that the challenged conduct of his trial counsel amounted to deficient perfomance or that his counsel's performance prejudiced the outcome of his trial.

In this timely appeal, the petitioner reiterates his claim of ineffective assistance of trial counsel, claiming that his trial counsel performed deficiently by failing to present at trial evidence favorable to the petitioner. Specifically, he argues that his trial counsel should have utilized the testimony of Doctor Walker, should have sought the suppression of Mr. Jordan's testimony based upon the loss of Mr. Jordan's pretrial statements to the police, and should have impeached Mr. Bond with a juvenile adjudication of robbery.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense,"

*Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are mixed questions of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the trial court's factual findings, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

*Testimony of Doctor Walker*

Although the petitioner claimed that his trial counsel performed deficiently by failing to present Doctor Walker as a witness at trial, trial counsel testified that it was his recollection that Doctor Walker's testimony would not have been favorable to the petitioner. Because the petitioner did not present Doctor Walker's testimony at the evidentiary hearing, the court is left to speculate about what testimony Doctor Walker might have, in fact, offered at trial. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). Thus, the petitioner failed to establish this claim.

*Testimony of Mr. Jordan*

Trial counsel stated that he utilized the loss of Mr. Jordan's pretrial statements to the police as fodder for cross-examination of both Mr. Jordan and the lead detective. He said that he did not entertain the idea of moving for exclusion of Mr. Jordan's testimony and that he believed his cross-examination of Mr. Jordan established that Mr. Jordan was "a liar." The petitioner did not present any evidence to contradict counsel's testimony and did not even attempt to establish the merits of a motion to dismiss based upon the loss of the statements. In consequence, he has failed to establish that trial counsel's handling of this issue amounted to deficient performance.

*Impeachment of Mr. Bond*

The record establishes that trial counsel did not attempt to impeach Mr. Bond with his juvenile adjudication of robbery. Our opinion on direct appeal indicates, however, that Mr. Bond acknowledged "that he was in custody at the time of the trial for a drug possession charge and had pending felony drug charges" and "that he had previously been convicted of two felony drug charges." *Demance Beasley*, slip op. at 4. Additionally, the petitioner failed to present evidence at the evidentiary hearing that Mr. Bond's charge of aggravated robbery actually resulted in an adjudication of delinquency or that the juvenile adjudication would have been admissible to impeach Mr. Bond's testimony. More importantly, however, we cannot say that, even if counsel's failure to utilize the prior adjudication qualifies as deficient performance, the failure prejudiced the petitioner's case.

Accordingly, we affirm the judgment of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE